<u>**NOT FOR PUBLICATION**</u>

UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

In re:   EDWARD M. ROSSI and
       KATHLEEN P. ROSSI,

                                     Chapter 7
                                     Case No.   09-40717 (MS)

              Debtors.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

SEAN G. McPARTLAND and
ELIZABETH J. CALIANESE McPARTLAND,    Adversary Proceeding

                     Plaintiffs,    Case No. 10-1284 (RTL)
        v.

EDWARD M. ROSSI,

              Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

<u>**OPINION**</u>

**APPEARANCES:**

JOSEPH M. CERRA, Esq.
Forman Holt Eliades & Youngman, LLC
Attorneys for Plaintiffs

JAMES A. KRIDEL, Esq.
The Kridel Law Group
Attorneys for Defendant

<u>**RAYMOND T. LYONS, U.S.B.J.**</u>

<u>**INTRODUCTION**</u>

Plaintiffs seek a determination that the debt due from the Debtor by reason of breach of a

home improvement contract is nondischargeable under 11 U.S.C. §523(a)(2)(A) for fraud.    After

trial, the court concludes that Plaintiffs have failed to carry their burden of proving that the Debtor

misrepresented his experience in the home improvement business, the time of completion, or how

Plaintiffs' money would be spent.    Judgment of no cause will be entered for the

Debtor/Defendant.

## JURISDICTION

This court has jurisdiction of this adversary proceeding under 28 U.S.C. § 1334(b), 28

U.S.C. § 157(a) and the Standing Order of Reference by the United States District Court for the

District of New Jersey dated July 23, 1984, as Amended on September 18, 2012, referring all

proceedings arising under Title 11 of the United States Code to the bankruptcy court.    This is a

core proceeding within the meaning of 28 U.S.C § 157(b)(2)(I) to determine the dischargeability

of a particular debt.

## FINDINGS OF FACT

Plaintiffs, Sean and Elizabeth McPartland, own a 150-year old home that they wanted to

renovate and expand.    They hired an architect to prepare plans and specifications for the project.

Next they interviewed several contractors and requested bids.    The Debtor, Edward Rossi, had

been referred to the McPartlands by a local policeman whose friend in an adjoining town had an

addition to his house completed by Mr. Rossi's company.    The McPartlands contacted Rossi and

met with him.    Mr. Rossi presented his business card as President of TLC Enterprises, Inc. of

Bergen County (TLC).    The card, which was not introduced into evidence, stated to the effect that

he had 25 years of experience.    Mr. Rossi told the McPartlands that he was the construction code

official in two nearby towns, that he had recently finished two additions in the next town, and that

he enjoyed working on older homes.    In fact, he lived in a home that was more than 100 years old.

2

He also represented that he could replicate the wooden corbels on their house so that the addition would conform to the original house.   Ms. McPartland went to the two homes where Mr. Rossi had recently worked, spoke to the homeowners, and learned that they were very satisfied with Mr. Rossi's company.   After receiving 3 or 4 bids, the McPartlands decided to go with Mr. Rossi and TLC.

Mr. Rossi prepared a short contract for TLC to complete the renovation and addition on the McPartlands' home in accordance with the architect's plans and specifications for a total price of $270,000.   No starting date, completion date or estimated time for completion, were stated in the contract.   Ms. McPartland testified that her husband told her that Mr. Rossi said the job would take about 5 months.   However, they discounted Mr. Rossi's estimate and anticipated that the job would be done in 8 months.   The contract, dated October 1, 2006, had a payment schedule as follows:

| | |
|---|---|
| Deposit: 10% | $27,000 |
| Start Up: | $80,000 |
| After Rough Inspection: | $90,000 |
| After Sheetrock & Spackle: | $50,000 |
| Completion: | $23,000 |

In November 2006, TLC and its electrical and plumbing subcontractors applied for building permits from the municipality.   While the applications were pending, TLC demolished the enclosed porch on the existing residence and excavated for the foundation and basement of the addition.   The municipality issued permits on December 5, 2006, and soon thereafter the huge, old boiler in the existing residence was dismantled and removed and a new boiler installed. Footings were poured and passed inspection then the foundation for the addition was completed by sometime in January 2007.

3

Not much happened on the job during the winter of 2007.   In late March, the framing subcontractor arrived and the addition was framed, roofed and closed to the elements.   Ms. McPartland was very complimentary of the work done by the framers.   Then the plumbing and electrical subcontractors roughed out their trades and some other interior work proceeded. Sheetrock was installed, tile and flooring were installed, and painting was done.

By May 2007, the McPartlands became concerned with the pace of the work.   According to them, Mr. Rossi almost never came to the site.   He had two moonlighting firemen doing the carpentry and they worked sporadically.   The subcontractors appeared less frequently, if at all, after the rough plumbing and electrical were installed.   The McParlands met with Mr. Rossi in June 2007 and he promised that the job would be completed in July 2007.   When little progress was made, they met again and he promised to finish in August 2007.   Again little progress was made, so in August the McPartlands prepared a three-page list of items needed to be completed. They were understandably concerned and upset.   They had been living through the construction for many months with only one functioning bathroom and no air conditioning.   Their children were due to resume schooling in September and needed their bedrooms finished to do homework. Of more concern, was the lack of heat after summer ended.

Most of the items on the August list remained incomplete, so the McPartlands updated the list in September 2007.   Again Mr. Rossi assured them that the job would be finished shortly.

On a Sunday in early October, Ms. McPartland happened to see the plumber in a convenience store.   She followed his truck to a jobsite at another house where she observed Mr. Rossi speaking to the homeowner and the two moonlighting firemen working on that project.   She concluded that TLC was neglecting to finish her home because it had moved on to another project.

She called Mr. Rossi who happened to be at his lawyer's office.   Mr. Rossi handed the

4

phone to his lawyer who started negotiations to resolve the dispute and promised Ms. McPartland

that TLC would provide a detailed completion plan soon.    Ms. McPartland printed signs and

placed them around her that directed workers not to come on the site and referred them to TLC's

lawyer for further information.

TLC did submit a detailed, three phase proposal to complete the work over a six week

period beginning October 2007.    The McPartlands rejected the proposal and declared TLC in

breach.    The McPartlands requested an inspection by the local construction official who

determined that several portions of the work done by TLC did not meet the building code and

needed to be remedied.    He also directed that the addition should not be occupied pending

remediation and completion.    The McPartlands also noticed that the new boiler was undersized.

It was supposed to be 250,000 BPUs but the one installed was only 200,000 BPUs and had to be

replaced.    In addition, the TLC had purchased corbels made of fiberglass rather than the custom

made wooden ones that were promised.

In reviewing the permit applications at the municipality the McPartlands noticed that the

plumbing permit application had been signed by a different plumber than the one who worked on

their house.    They contacted the plumber who signed the application.    He immediately came to

their house, got the heat working, and completed the rest of the plumbing for no additional charge.

They hired another contractor to complete the work on a time and material basis.    They

also engaged the new contractor for substantial additional work, including a kitchen renovation.

The McPartlands paid the new contractor approximately $130,000 of which $100,000 is estimated

to relate to completion of the TLC contract and correction of defective work by TLC.    He further

estimated that about 60% of what he was paid was to finish uncompleted work and about 40% was

to correct defective work.    The new contractor initially estimated the TLC's contract was 90%

5

complete at the time TLC was prohibited from the site.    He later revised his estimate down as he

got into the work and discovered more items to complete or redo.    At the conclusion of his work

the new contractor estimated the TLC had completed about 70% of its contract, if not less.

Rossi's position is that TLC was wrongfully refused access to the property; that TLC

would have completed the contract and would have been entitled to the balance of the contract

price - $23,000 – plus extras estimated at approximately $9,000.    He testified that TLC had

completed 90% of the contract.    Any delays in completing the work are attributable to the

McPartlands untimely selection of materials such as tile and their change from radiators to

baseboard heat, says Mr. Rossi.    In addition, the McPartlands engaged his subcontractors to do

additional work outside TLC's contract and that disputes between those subcontractors and the

McPartlands contributed to the delays.    He denies that the McPartlands are owed anything by

TLC or him.

McPartlands sued TLC, Rossi and their subcontractors in state court alleging, *inter alia*,

breaches of the New Jersey Consumer Fraud Act and common law fraud.    The state court ordered

TLC to account for all money it had spent on the McPartland project.    In compliance with that

order, TLC produced a list of checks by vendor totaling $199,108.74.    It later supplemented that

report with additional expenses totaling $46,416.67 including payments to the two firemen and

Mr. Rossi's vehicle lease payments.    While McPartlands' demand for TLC's bank records was

pending in state court, both TLC and Rossi filed bankruptcy.

McPartlands obtained TLC's bank records following the bankruptcy.    To their chagrin,

they discovered that, although they had paid the deposit of $27,000 on signing the contract plus

$80,000 on startup of the job in December 2006, by the end of January 2007, TLC's bank account

was overdrawn.    They surmised that TLC had used their $107,000 up front money in other ways

6

and did not have sufficient money to complete the job even though they had paid $247,000 by the

time they declared a breach in October 2007.    They attribute the delays and failure to complete to

this diversion of their initial $107,000 which they equate to the approximately $100,000 it cost

them to have the work finished by another contractor.

Plaintiffs called a certified public accountant as an expert witness.    He had analyzed

TLC's bank statements and TLC's accounting of disbursements related to the McPartland home

improvement.    He compared the money McPartlands had paid under the contract to the amounts

TLC had spent on their job and the balance in TLC's bank account on a month by month basis.    At

the end of each month he found that the McPartlands had paid more than TLC had spent on their

job.    He termed the difference the "McPartland Balance".    If TLC's bank balance was less than

the McPartland Balance he called the difference a "deficiency".    As of the end of January 2007

the McPartlands had paid a total of $107,000 and TLC had expended only $8,801.30 on the job,

thus the McPartland Balance was $98,198.70.    However, TLC's bank balance was a negative

$691.51 yielding a deficiency of $98,890.21.    In each succeeding month there was a cumulative

deficiency that reached a high of $129,073.45 as of the end of April 2007.    However, at the end of

September 2007, after McPartlands had paid a total of $247,000, the deficiency was only

$8,784.29 and TLC had a bank balance of $37,780.24.    At the end of his report, the expert

concluded that the cumulative deficiency was $18,435.38.    In addition, the expert determined that

from September 28, 2006, the date of the McPartlands' first payment, through October 22, 2007,

when TLC was prohibited from the site, TLC had disbursed $702,086.75 through its checking

account of which only $247,000 came from the McPartlands.    Plaintiffs also introduced into

evidence TLC's federal income tax returns.    They showed that TLC had gross income of

$787,038 in 2006, $550,000 in 2007 and $289,911 in 2008.    The declining revenue coincided

7

with the global economic downturn.

The accuracy of the amounts spent by TLC on the McPartland home improvement is questionable.   The list of disbursements prepared on behalf of TLC in the state court litigation is not supported by invoices from material suppliers, subcontractors or payroll records.   Apparently TLC's accountant had the company's records when he moved out of state and could not be located. Therefore, Plaintiffs' expert could not verify the accuracy of TLC's disbursements.   On the other hand, TLC's list of disbursements only includes payments made during 2007.   At trial, Mr. Rossi was able to identify several disbursements during 2006 that were not included in TLC's accounting.   Nevertheless, the expert's report and testimony were very informative and led the court to conclude that, although the McPartlands had paid TLC more than TLC expended on their job, by the end of September 2007 the cumulative deficiency was only $8,784.29 indicating that TLC had spent on the job nearly as much as McPartlands had paid under the contract.   Second, the fact that the cumulative deficiency reached a high of $129,073.45 as of the end of April 2007 but was reduced to $8,784.29 as of the end of September 2007, during which time McPartlands only paid $25,000, indicates that TLC had other sources of cash to fund the McPartland project.   Third, the fact that over $700,000 was disbursed through the TLC account between September 2006 and October 2007, of which only $247,000 came from McPartlands, also indicates that TLC had other sources of funding to use on the McPartlands' house.   Fourth, TLC's tax returns show gross income well in excess of the amounts paid by the McPartlands, indicating that it was a substantial company conducting a large volume of business.

One final point on TLC's finances:   Plaintiffs introduced into evidence the bankruptcy petition and schedules filed by TLC on November 13, 2009.   It is remarkable that there were only two unsecured creditors, other than the McPartlands and the lawyer who defended TLC in state

court.   The two other trade creditors had claims totaling only $11,070.   No other homeowners were listed as creditors.   The only law suit disclosed in TLC's statement of financial affairs is the McPartlands' state court action.   This evidence leads the court to conclude that TLC paid its bills and satisfied its customers.   It was the declining economy and the dispute with the McPartlands that landed the company in bankruptcy.

## DISCUSSION

Suits by homeowners to have their claims against home improvement contractors declared nondischargeable are common.   Homeowners are understandably upset when work on their home is incomplete, shoddy, or not done at all.   New Jersey statutes and regulations address this common problem and make regulatory non-compliance a per se violation of the New Jersey Consumer Fraud Act, entitling the homeowner to treble damages plus attorney's fees.   N.J. STAT. ANN. 56:8-1 et seq.; N.J. ADMIN. CODE § 13:45A-16 to 16.2 (2012); *Cox v. Sears Roebuck & Co.*, 647 A.2d 454 (N.J. 1994).

Whether the home improvement contractor's debt is dischargeable in bankruptcy is a different issue.   Violation of the Consumer Fraud Act does not equate to fraud within the meaning of section 523(a)(2)(A) of the Bankruptcy Code.   The creditor must prove that the debt was procured by fraud as that term has been used by Congress and interpreted by the U.S. Supreme Court.   *Holden v. Altieri* (*In re Altieri*)*, 2012 WL 3595298 (Bankr. D.N.J. Aug. 20, 2012).

In the more egregious cases where a contractor takes a large deposit but never performs any work or delivers any materials, courts have found that the contractor fraudulently misrepresented his intent to fulfill the contract and held the debt nondischargeable.   *See, e.g.*, *Seiders v. Fenninger* (*In re Fenninger*), 49 B.R. 307 (Bankr. E.D.Pa. 1985).   However, where the work is incomplete or shoddy, most courts have found a breach of contract, but not fraud.   *See, e.g.*,

9

*Freedman v. Grinaway* (*In re Grinaway*), 2008 Bankr. LEXIS 1103 (Bankr. D.N.J. Apr. 3, 2008); *see also DiPietro v. Drossel* (*In re Drossel*), 2007 Bankr. LEXIS 3862 (Bankr. D.N.J. Nov. 7, 2007); *Strominger v. Giquinto* (*In re Giquinto*), 388 B.R. 152, 166 (Bankr. E.D.Pa. 2008).   Even where the entire project was done so poorly that it had to be torn down, the plaintiff was unable to sustain a fraud complaint.   *Holden*, 2012 WL 3595298.

**Fraud**

"The overriding purpose of the Bankruptcy Code 'is to relieve debtors from the weight of oppressive indebtedness and provide them with a fresh start.'"   *Starr v. Reynolds* (*In re Reynolds*), 193 B.R. 195, 200 (D.N.J. 1996) (quoting *Insurance Co. of N. Am. v. Cohn* (*In re Cohn*), 54 F.3d 1108, 1113 (3d Cir. 1995)).   Accordingly, exceptions to discharge are to be narrowly construed. A countervailing policy is that debts incurred through fraud should not be discharged.   The discharge is reserved for the honest but unfortunate debtor.   *Grogan v. Garner*, 498 U.S. 279, 286-287 (1991).   "Where a debtor has committed fraud under the code, he is not entitled to the benefit of a policy of liberal construction against creditors."   *Cohen v. De La Cruz* (*In re Cohen*), 106 F.3d 52, 59 (3d Cir. 1997), *aff'd* 523 U.S. 213 (1998).   This countervailing policy is codified in § 523(a)(2)(A) of the Bankruptcy Code which provides:

> A discharge under section 727 . . . of this title does not discharge
> an individual debtor from any debt . . . for money, property,
> services, or an extension, renewal, or refinancing of credit, to the
> extent obtained by false pretenses, a false representation, or actual
> fraud. . . .

11 U.S.C. § 523(a)(2)(A) (2012).

This fraud exception to discharge has been part of the bankruptcy law of the United States since 1898.   *Cohen v. De La Cruz* (*In re Cohen*), 523 U.S. 213, 217 (1998); *Field v. Mans*, 516 U.S. 59, 64-66 (1995).   Since Congress has not provided a separate definition, fraud has the same

meaning in the Bankruptcy Code as in the common law of torts.   *Id.* at 69-70.

> The operative terms in § 523(a)(2)(A), on the other hand, "false
> pretenses, a false representation, or actual fraud," carry the acquired
> meaning of terms of art.   They are common-law terms, and, as we
> will shortly see in the case of "actual fraud," which concerns us
> here, they imply elements that the common law has defined them to
> include. . . .

> It is . . . well established that "where Congress uses terms that have
> accumulated settled meaning under . . . the common law, a court
> must infer, unless the statute otherwise dictates, that Congress
> means to incorporate the established meaning of these terms." . . .

> [W]e will look to the concept of "actual fraud" as it was understood
> in 1978 when that language was added to § 523 (a)(2)(A).   Then, as
> now, the most widely accepted distillation of the common law of
> torts was the Restatement (Second) of Torts (1976), published
> shortly before Congress passed the Act.

*Id.* (internal citations omitted).

Following the Court's guidance, one should look to the Restatement for the meaning of

fraud.   The Restatement (Second) of Torts, § 525, sets forth the law regarding liability for

fraudulent misrepresentation.

> One who fraudulently makes a misrepresentation of fact, opinion,
> intention or law for the purpose of inducing another to act or to
> refrain from action in reliance upon it, is subject to liability to the
> other in deceit for pecuniary loss caused to him by his justifiable
> reliance upon the misrepresentation.

As the Supreme Court pointed out, "courts that have previously construed this statute, routinely

requir[e] intent, reliance, and materiality before applying § 523(a)(2)(A)."   *Field*, 516 U.S. at 68.

Thus, for a debt to be nondischargeable under § 523(a)(2)(A) the creditor must prove that:

(1) the debtor represented a fact, opinion, intention or law;

(2) the representation was false;

(3) the representation was material;

(4) the debtor obtained money, property or services through the misrepresentation;

(5) the debtor knew at the time that the statement was false (or was made with reckless disregard for its truth);

(6) the debtor intended the creditor to rely on the statement;

(7) the creditor actually relied on the statement;

(8) the reliance was justified;

(9) the creditor sustained damage; and

(10) the damages were the proximate result of the false representation.

*Cohen v. De La Cruz*, (*In re Cohen*), 191 B.R. 599, 604 (D.N.J. 1996), *aff'd sub nom.* 106 F.3d 52 (3d Cir. 1997), *aff'd* 523 U.S. 213 (1998); *AT&T Universal Card Servs. Corp. v. Wong* (*In re Wong*), 207 B.R. 822, 826 (Bankr. E.D.Pa. 1997).   The plaintiff bears the burden of proving the objection to discharge.   FED. R. BANKR. P. 4005.   Each element of the objection must be proved by a preponderance of the evidence.   *Grogan*, 498 U.S. at 287-88; *Starr v. Reynolds* (*In re Reynolds*), 197 B.R. 204, 205 (Bankr. D.N.J. 1996).

The complaint in this case has nine counts and 166 paragraphs, hardly the short and plain statement of the claim required by FED. R. CIV. P. 8(a)(2).   The first count seeks a determination of nondischargeability for fraud under 11 U.S.C. § 523(a)(2)(A).   That is the only count that is relevant here.   Count Two seeks a determination of nondischargeability under 11 U.S.C. § 523(a)(4) (fraud or defalcation while acting in a fiduciary capacity) and alleges that funds were to be held in escrow.   In their opening statement and closing arguments, Plaintiffs made no argument on Count Two, nor did they produce any evidence of any escrow agreement.   Plaintiffs have abandoned Count Two.   Counts Three through Nine are all state law claims.   This court indicated that it might not consider these state law counts but would only determine

dischargeability.   If the court were to determine the debt nondischargeable, the Plaintiffs could

proceed to state court for judgment and enforcement of their state law claims.   Because of the

outcome of the trial, Counts Three through Nine need not be considered.

**Experience**

Count One of the complaint alleges the following:

> 128.   Rossi and TLC further represented to the Plaintiffs that they had substantial experience in the residential construction industry.

> 129.   Rossi and TLC further represented to the Plaintiffs that they had the experience necessary to complete the Plans for the Premises.

Ms. McPartland testified about their search for a qualified contractor to construct the

addition and renovation of their home.   A local police officer referred Mr. Rossi who built an

addition on his friend's house.   Mr. Rossi presented his card that stated that he had 25 years of

experience.   He told the McPartlands that he was the construction code official in two

neighboring towns and touted his ability to complete the work on their house according to the

plans and specifications.   He provided two references for projects recently completed.   The

McPartlands confirmed those references, visited the sites, and received positive reports about

those owners' experiences with Mr. Rossi and TLC.   Ms. McPartland testified that 25 years of

experience as a general contractor was important to her because it indicated sustained reliability

and competence.

Plaintiffs argue that poor performance of their job and poor management of their funds

demonstrated that Mr. Rossi did not have the experience as a general contractor as he represented.

Specifically, they point to improper sequencing of work by the subcontractors, requiring removal

of some work so that things that should have been done first could be accomplished.   Also, they

point to the negative balance in TLC's bank account at the end of January 2007 and the deficiency

calculated by their expert as evidence that Mr. Rossi did not manage his business as an

experienced general contractor.

Mr. Rossi testified at trial that he has been in the home remodeling business for most of his

career since he got out of the air force in 1970.   He started as a carpenter's assistant for his uncle

while still in school.   After a short stint with his father's trucking company, he worked with a

landscaping and excavating firm.   He then worked as a carpenter with a home remodeler for four

years in the early 1980's.   In 1985, he began doing home remodeling as a sole proprietor under the

name TLC Enterprises.   Most of that work was smaller projects that did not include additions.   In

1990, he did his first larger project that included an addition over a new foundation.   Since 1990,

he has done a number of large projects including the two recent references that were verified by the

McPartlands.   TLC was incorporated in 2003.

Mr. Rossi's testimony at his deposition was not as detailed.

> Q.   Now, you indicated to me that TLC was incorporated in 2003;
> correct?
> A.   I believe so, yes.
> Q.   Did you ever represent to the plaintiffs that you and TLC had 25
> years' experience as a home contractor?
> A.   I did.
> MR. KRIDEL:   One objection as to form, just to the word
> "plaintiffs."   This is a 2004, so - - we don't really have a plaintiff.
> Q.   Rephrase that question.
> Did you ever represent to the McPartlands that either you or TLC
> had 25 years of experience as a home contractor?
> A.   That I did, yes.
> Q.   How about TLC?
> A.   Well, TLC wasn't formed 25 years ago, no, but I certainly have
> - - had more than that.
> Q.   So prior to the creation of TLC, can you describe for me your
> personal experience as a home contractor?
> A.   As a home contractor, I - -
> Q.   Yes.

14

MR. KRIDEL:   I just want to make one objection to form in that that word came into existence at a date more recent than I think his experience.

However, you can answer the question as if that existed indefinitely.

THE WITNESS:   As if the company - -

MR. KRIDEL:   Why don't you answer the question.   I think my objection stands.   Go ahead.

A.   Okay.   I worked in the industry, I worked for people.   I have been doing it since I got out of the service in 1969.

Q.   So since you got out of the service in 1969, you have been involved in the business of home contracting?

A.   In the construction industry.

Q.   In the construction industry.

A.   Yes.

Q.   Prior to the formation of TLC, did you ever own an interest in a construction company?

A.   I operated for a short period of time as - - trying to remember now, it's so long ago.   I was a sole proprietor for a short period of time.

Q.   When was that, sir?

A.   Can't remember.

Q.   Is it fair to say, then, prior to 2003 and other than that period of time where you operated as a sole proprietor, you were employed by others in the field of construction?

A.   Yes, different times.

Q.   Will you describe what those experiences were?

A.   Worked for a carpenter, another contracting company.   I was in the dump truck business with my father with excavation and soil removal.   I did construction and landscape work, outside, inside. In the industry, in the construction industry, since 1969, '70, I would say, yeah.

Q.   You indicated you worked for a carpenter.

A.   Yeah, of a company no longer in business.

Q.   What company is that?

A.   I worked for a family company which was my uncle who is long deceased.   I worked on developments with him and in homes. I worked for a carpenter, was called Elite Carpentry in Hillsdale.   I worked there for probably about five years.

Q.   You also indicated you worked for another contracting company.   What was that, sir?

A.   Joe Ed Trucking was my father's company.

Q.   So you were not referring to another home construction contracting company.

A.   No.

Q.   You indicated you were in landscape.

15

A.   Landscape construction, yes excavation, soil removal, all of it.

Q.   Did you ever work for a firm, sir, which was - - that functioned as a general contractor, a home contracting services?

A.   Yes.

Q.   What firm was that?

A.   Elite Building.

Q.   When was that, sir?

A.   When?

Q.   Yes.

A.   Early '80s at some point I am going to say.

Q.   For how long?

A.   Four years.

Q.   Is it fair - - strike that.

Q.   Is it correct that other than your involvement as an employee with Elite Contracting in the 1980s, that at no time prior to the formation of TLC you were involved with a home contracting company which functioned as a general contractor for home improvement projects?

A.   No.

Q.   It's not correct to say that?

A.   It is correct to say that, yes.

Q.   Did you tell the McPartlands that when you were discussing their contract with them?

A.   Did I?

Q.   Tell them that prior to your involvement with TLC, you had but one other involvement with a home contracting company as an employee during a period of time perhaps 20 years earlier?

A.   No. No. Because experience in the industry is experience.   I mean, you gain something throughout all aspects of it.

Q.   But you held yourself out as having 25 years experience in the home contacting business, sir.

A.   No, in the industry, in the construction industry.

Transcript of Rule 2004 deposition of Edward Michael Rossi taken March 5, 2011 at 38:15 to 43:8.

Q.   It is correct, sir, that prior to your involvement with TLC, you never had ownership interest in any home improvement contracting business?

MR. KRIDEL:   Objection as to form, but he can answer the question.

Q.   Do you understand the question, sir?

A.   Yes.   I answered that question before.

Q.   And your answer was?

A.   That I had - - I was a sole proprietor for a time.

16

Q.  Okay.
A.  Didn't do anything big.   It was all small stuff, side work and - -
Q.  What type of work, sir?
A.  It was all small jobs.
Q.  You described it as side work?
A.  Side work, you know.
Q.  Work you did on the side?
A.  Things - - jobs that I did, I did after hours.
Q.  Did TLC exist as an entity in any form prior to its
incorporation?
A.  No.

Transcript of Rule 2004 examination of Edward Michael Rossi taken March 5,
2011 at 45:17 to 46:15.

Q.  As I would understand it, TLC had never, prior to the
McPartland job, functioned as a GC on a job requiring the services
represented on the fifth page of M-8.
A.  Only in size.   That is all - - it's all the same - - construction –
the construction is the same regardless of the size of it.
Q.  Okay.   But it is fair to say that this is essentially the largest
project TLC had ever functioned as a GC on.
A.  This might have been the largest.
Q.  Might have been the largest?   Which one might have been
larger?
A.  Well, yeah, it was the largest.

Transcript of Rule 2004 examination of Edward Michael Rossi taken March 5,
2011 at 58:15 to 59:3.

When confronted with the apparent discrepancy between his deposition testimony and trial

testimony, Mr. Rossi acknowledged that he perhaps misused the term "short" to refer to the time

he operated as a sole proprietor.   Plaintiffs' counsel argues that if Mr. Rossi had disclosed the

details of his work prior to incorporation in 2003, counsel could have investigated prior projects to

verify whether Mr. Rossi had been doing larger projects since 1990.

Descriptions of one's experience and the quality of one's work are opinion or puffery and

not a representation that could form the basis of fraud.   *Nickerson v. The Quaker Group*, 2008 WL

2600720, at *12 (N.J. Super. App. Div. July 3, 2008).   One major exception to the general

17

treatment of such statements is the New Jersey Supreme Court case *Gennari v. Weichert Co. Realtors*, 691 A.2d 350 (N.J. 1997).   In that case the principal of a new home builder, his sales agent wife and her employer were held liable for fraudulently misrepresenting that the principal "was an experienced builder who had built hundreds of quality homes throughout New Jersey. The facts were to the contrary.   Generally speaking, he had always worked under the supervision of others, primarily his brother-in-law, [P.K.].   His workmanship, moreover, was disastrous." *Id.* at 355.   In *In re Tapper*, 123 B.R. 594 (Bankr. N.D.Ill. 1991) the debtor misrepresented his qualifications where the court found, "He had no more skills in construction than a child with an Erector set."   *See also*, *Stevens v. Antonious* (*In re Antonious*), 358 B.R. 172 (E.D.Pa. 2006).

In this case, the court finds that Mr. Rossi did not misrepresent that he had 25 years of experience.   That statement was true.   He had worked in the home improvement business since at least 1970.   The court also accepts as true his trial testimony that he began working on his own under the sole proprietorship name TLC Enterprises in 1985 and that he had experience doing additions as well as renovation.   Although his deposition testimony may not be totally consistent with his trial testimony, the main discrepancy seems to be the length of time he operated as a sole proprietor before incorporation in 2003.   It appears that during his deposition, Mr. Rossi's memory was faulty as to when he changed from a sole proprietor to a corporation but otherwise confirms that after he left Elite Carpentry in 1985 he had his own home improvement business.

The McPartlands asked for references and were given two addresses in the adjoining town. They went to the sites, spoke to the owners, and received positive reports about TLC and Mr. Rossi.   Making independent verification of such quality representations indicates a lack of reliance on the statements alone.   *DSK Enterprises, Inc. v. United Jersey Bank*, 459 A.2d 1201 (N.J. Super. App. Div. 1983), *cert. denied* 468 A.2d 232 (N.J. 1983).

18

As to the Plaintiffs' contention that the analysis of TLC's checking account demonstrates that he lacked skill as a general contractor, a similar argument was rejected in *Strominger v. Giquinto* (*In re Giquinto*), 388 B.R. 152, 176-77 (Bankr. E.D.Pa. 2008).

The court finds that Mr. Rossi's representations about his experience in the home improvement business were true and are no cause to hold the debt nondischargeable.

**Time of Completion**

Paragraph 130 of the complaint alleges, "Rossi and TLC represented to the Plaintiffs that the work to complete the Plans for the Premises would be commenced and completed in a timely fashion."   The written contract has no start date, completion date or representation of the amount of time the job would take.   Ms. McPartland testified that her husband told her that Mr. Rossi said the job would take about 5 months, but she and her husband did not accept that estimate and anticipated it would take 8 months.   Mr. Rossi testified that he told the McPartlands that the job would take between 6 and 9 months.   It is not necessary to determine whose recollection is correct because there was no evidence from which the court could find that any statement regarding time of completion was fraudulent.   First of all, it is unclear when the work commenced.   Some demolition began in November 2006 before the building permit was issued in December 2006. The excavation and foundation for the addition were done soon after the permit was issued, but according to Ms. McPartland nothing was done during the winter.   Work began in earnest with the framing in March 2007 and stopped when the McPartlands refused TLC access to their premises in October 2007.   It is difficult to find that there was any misrepresentation as to time of completion. Certainly, there is no evidence from which the court could conclude that Mr. Rossi knew what he said was false or that he intended to deceive the McPartlands.   Significantly, it is clear that the McPartlands did not rely on Mr. Rossi's statement about the time of completion because they did

19

not accept the estimate of 5 months and come to their own conclusion that it would be 8 months.

There is no cause to hold the debt nondischargeable because of statements regarding time of

completion.

**Deposit and Start-up**

The complaint alleges:

> 124.   Additionally, the Plaintiffs advanced monies to Rossi
> and TLC upon their representations that these advances were
> necessary in order to move forward with the Renovations and that
> such funds would be held in escrow for the benefit of the Plaintiffs,
> and disbursed to pay for costs of the Renovations.

> 125.   However, Rossi diverted these funds from escrow, in
> violation of his promises to the Plaintiffs, for purposes of
> constructing a house in Virginia for his personal use, which he
> subsequently transferred to a relative.

The contract calls for payments at certain milestones.   Significantly, it requires a deposit

of $27,000 on signing and an additional payment of $80,000 upon start up.   The written contract

does not require funds to be held in escrow or segregated in any way.   Plaintiffs abandoned Count

Two of the complaint that sought a determination of nondischargeability under section 523(a)(4)

for fraud or defalcation while acting in a fiduciary capacity apparently because they could not

prove the existence of a trust relationship; however, these allegations in Count One of the

complaint seem to seek the same relief.

No proof was presented that Mr. Rossi made any oral representation as to how the deposit

monies would be used.   Plaintiffs argue that the contract provision requiring payment at

"start-up" means that their money should be used to pay for materials and labor on their house.

The fact that TLC's bank account was overdrawn by the end of January 2007 when little work had

been done and that TLC's accounting of disbursements on the McPartland job shows minimal

expenditures before January 31, 2007, demonstrates that their money was diverted to other uses. Furthermore, they argue that Mr. Rossi knew that he would not use their money for their job when he accepted the deposit of $27,000 and the start-up payment of $80,000.   That amounts to fraud according to Plaintiffs.

The court finds that there was no express representation either in the written contract or orally by Mr. Rossi that the money paid by the McPartlands would be used exclusively on their house.   Therefore there was no express misrepresentation.   But, Plaintiffs argue that as a matter of policy the court should imply a representation by TLC that the deposit money and especially the start-up money are meant to be used on the McPartland home; and that Mr. Rossi knew when he accepted the money that TLC would use it elsewhere.   Plaintiffs have cited no other case that has implied such a representation.   The court has found only one similar case.   *Fugere v. Whitford* (*In re Whitford*), 95 B.R. 5 (Bankr. D.R.I. 1989).   In that case, the venerable Bankruptcy Judge Votolato found that the contractor expressly stated that he needed a large deposit to purchase materials for the plaintiff's project.   He found that representation was false and held the debt nondischargeable.   This case is distinguishable.   Plaintiffs presented no evidence that Mr. Rossi expressly stated that the McPartlands' deposit money would be used on their project.   To the contrary, Mr. Rossi testified that TLC comingled all funds in one account and disbursed it to suppliers, subcontractors and workers as it saw fit.   The court declines the Plaintiffs' invitation to find as a matter of policy that the payment milestone in the contract requiring a large payment on "start-up" was an implied representation that the funds would be used primarily on the McPartland project.   Adopting such a policy would have too many ramifications beyond the facts of this case and could impact many situations where contracts provide for progress payments.   Owners can better protect themselves by negotiating more favorable payment terms or employing a

construction draw technique where partial payments are due only after the architect certifies the value of the work completed to date.   The New Jersey legislature and Division of Consumer Affairs have adopted comprehensive laws and regulations governing the home improvement business and have not included the policy that Plaintiffs advocate.   By contrast, the legislature requires all funds for the purchase of a time share to be held in escrow, N.J. STAT. ANN. 45:15-6.57(e)(1) (2012), and the Department of Community Affairs has adopted a regulation requiring all purchaser funds to be held in escrow in connection with a Planned Real Estate Development.   N.J. ADMIN CODE 5:26-6.4 (2012).   The policy decision of whether a homeowner's funds should be held in escrow in connection with a home improvement contract is best left to the legislative and executive branches of government.

## CONCLUSION

Plaintiffs have failed to prove that Defendant misrepresented his experience, the time of completion, or the use of their funds.   Judgment will be entered in favor of Defendant finding no cause to find his debt to Plaintiffs nondischargeable.

Dated: February 14, 2013                              **/S/Raymond T. Lyons**
                                                      United States Bankruptcy Judge